UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | Civil No. 3:12cr164 (JBA) |
| *v.* | |
| HECTOR NATAL and HECTOR MORALES. | August 7, 2014 |

**RULING ON POST-TRIAL MOTIONS**

On January 8, 2013, a Grand Jury returned a Second Superseding Indictment [Doc. # 70] in *United States v. Natal et al.*, 3:12cr164, charging Defendants Hector Natal and Hector Morales with Conspiracy to Distribute and to Possess with Intent to Distribute Narcotics in violation of 21 U.S.C. § 846 (Count One), Witness Tampering in violation of 18 U.S.C. §§ 1512(b)(1) and (2) (Count Nine), and Conspiracy to Tamper with Witnesses in violation of 18 U.S.C. § 1512(k) (Count Ten). Defendant Hector Natal was individually charged with Attempted Arson in violation of 18 U.S.C. § 844(i) (Count Two) and Arson Resulting in Death in violation of 18 U.S.C. § 844(i) (Counts Three, Four, and Five). Defendant Hector Morales was individually charged as an Accessory After the Fact to Arson Resulting in Death in violation of 18 U.S.C. § 3 (Counts Six, Seven, and Eight) and Destruction and Concealment of Evidence in violation of 18 U.S.C. § 1519 (Count Eleven). On April 18, 2013, after a fifteen-day trial, a jury returned a verdict convicting Mr. Natal and Mr. Morales on all of these counts. Mr. Morales moves [Doc. # 211] pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure for a Judgment of Acquittal and a New Trial. Additionally, Mr. Natal moves [Doc. # 249] pursuant to Rule 33 of the Federal Rules of Criminal Procedure for a New Trial. For the

following reasons, Defendant Morales's motion is granted in part and denied in part, and Defendant Natal's motion is denied.

## I.       Summary of the Evidence

The following is a summary of the evidence presented to the jury at Defendants' trial:

### A.       Narcotics Conspiracy

At trial, Mr. Natal's counsel essentially conceded that Mr. Natal was involved in narcotics trafficking.  (Trial Tr. Vol. I [Doc. # 228] at 63 ("As far as Mr. Natal is concerned, this is not a case about whether Hector [Natal] was involved in drug dealing. He was.  He already pled guilty in this court to dealing drugs during this time period."); Trial Tr. Vol. XV [Doc. # 242] at 3475 ("As Mr. Sheehan said in his opening remarks, we do not dispute that Hector Natal was a drug dealer."); *see also* Natal Mem. Supp. [Doc. # 250] at 1.)  The Government introduced evidence at trial to corroborate this admission, and to establish that Mr. Morales participated with his son in this enterprise.  Margaret Batts, Defendants' neighbor, testified that she witnessed Mr. Natal selling drugs from his porch on Poplar Street in front of his mother and father.  (Trial Tr. Vol. II [Doc. # 229] at 469–73.)  The Government also read Mr. Morales's grand jury testimony into evidence, in which he admitted that he knew his son sold drugs.  (Trial Tr. Vol. XI [Doc. # 238] at 2690–91.)

Several of Mr. Natal's associates testified that Mr. Morales not only had knowledge of Mr. Natal's drug dealing, but that he actively participated in it by knowingly driving him to and from drug transactions.  Gabriel Vega testified that Mr. Morales had driven him and Mr. Natal to a drug transaction on Monroe Street, and had warned his son that it was "hot in the streets."  (Trial Tr. Vol. VIII [Doc. # 235] at 1812.) Mr. Vega

testified that he recalled Mr. Natal giving Mr. Morales either drugs or money when he returned to the van.  (*Id.* at 1813).  Mr. Vega also testified that Mr. Morales drove his son to the corner of Howard and Spring Streets on the night of March 8, 2011 so Mr. Natal could pick up a $40 drug payment from Mr. Vega.  (*Id.* at 1815–17.)  Similarly, Jessica Feliciano, Mr. Natal's then-girlfriend, testified that she had witnessed Mr. Morales driving his son to a drug transaction.  (Trial Tr. Vol. X [Doc. # 237] at 2302–08.)  Specifically, she testified that she was with Mr. Natal when his father drove him to purchase a large quantity of marijuana, and that the smell of the drugs in the car was overwhelming.  (*Id.* at 2302–03.)  She testified that on that occasion, Mr. Morales had warned his son that it was "too hot" and that the cops were watching the area.  (*Id.* 2332–04.)  Ms. Feliciano testified that Mr. Morales had also been present when Mr. Natal was repackaging drugs for sale.  (*Id.* at 2304.)  Finally, she testified that Mr. Natal always gave his money from these sales to his father to hold.  (*Id.* at 2307–08.)

### B.    Attempted Arson

The  Government  presented  testimony  from  two  witnesses  that  Mr.  Natal attempted to set fire to 48-50 Wolcott Street before the fatal arson in March 2011.  Jammi Neely testified that she and her cousin Quavon Roberson witnessed Mr. Natal in the second floor stairwell of 48-50 Wolcott Street "lighting matches," and "trying to light the rug" (Trial Tr. Vol. XI at 2572, 2579), and that upon witnessing this, they ran to their Aunt Wanda's apartment and asked their cousin to call the police (*id.* 2574–75).  She testified that the police came and spoke with her cousin and her aunt, and then went across the street to Defendants' home.  (*Id.* at 2576–78.)  This testimony was corroborated by, Mickaylah Roberson, Ms. Neely's cousin, who testified that she had been in the apartment that day and that she had witnessed Quavon and Jammi run into the

apartment screaming that Mr. Natal was in the hallway trying to light the carpet on fire. (*Id.* at 2596–97.)

### C.    Arson

The Government presented witness testimony and recordings to establish that Mr. Natal set the fatal arson at 48-50 Wolcott Street in the early morning of March 9, 2011 and that Mr. Morales was an accessory after the fact to that crime.  Three separate witnesses testified that they heard Mr. Natal admit to setting the fire that night.  Mr. Vega testified that on the morning after the fire he overheard a conversation between Mr. Natal and one of his associates, Chad Mendes, in which Mr. Natal made a statement to the effect that "they" owed him money and that he had started the fire.  (Trial Tr. Vol. VIII at 1826–27.)  Mr. Vega testified that at the time he did not understand what Mr. Natal was referring to with this statement.  (*Id.* at 1827.)   After this incident, Mr. Vega began cooperating with law enforcement, and on March 25, 2011, he recorded a conversation in which Mr. Natal admitted to setting the Wolcott Street fire:

> Vega:   Yo, so how you burn that crib, my n*gga?
> Natal:  What you mean?
> Vega:   N*gga, the crib right there on Wolcott.
> Natal:  Them n*ggas owe me bread, n*gga.
> Vega:   You willin' son, how you do that sh*t?
> Natal:  What you mean, you willin' right now talking like that.
> Vega:   N*gga, how you do that sh*t n*gga? Just tell me n*gga, cause n*ggas rolled up on me willin' son like for real bro that sh*t ain't real, my n*gga, I'm out here trappin' for n*ggas and sh*t, y'all gonna get me locked up and shot up and sh*t.  How the f*ck y'all n*ggas do that sh*t, who you do it with?
> Natal:  By myself, you know what I mean, I don't need nobody else.

(Gov't Ex. 104.)  At trial, Mr. Vega testified that he understood Mr. Natal to mean that he had started the fatal fire on Wolcott Street as a result of a drug debt.  (Trial Tr. Vol. VIII at 1881–84.)

4

Ms. Feliciano also testified that Mr. Natal had admitted to her that he set the fire. She stated that during a conversation at his sister's house he had expressed regret over starting the fire:

> Q:    And what were you talking about?
> A:    I started asking him questions why is he being investigated, why his name is coming up constantly, and he broke down on me. He got on his knees, and hold me by my waist and told me he's sorry, he sorry. He said, "I'm sorry, I'm sorry, I ain't mean to do that."
> Q:    He said I'm sorry, I'm sorry, I didn't mean to do that?
> A:    Correct.
> Q:    What was he talking about?
> A:    About the fire.

(Trial Tr. Vol. X at 2821–83.)

Fire Marshal Faustino Lopez, who was working undercover posing as Mr. Vega's cousin (Trial Tr. Vol. IX at 2216), also recorded a conversation with Mr. Natal on April 15, 2011 in which Mr. Natal tacitly accepted responsibility for the fire. Fire Marshal Lopez testified that he had spoken on the phone with Mr. Natal to vouch for Mr. Vega's loyalty by explaining that if Mr. Vega had wanted to, he could have turned Mr. Natal into the police for setting the fire and collected the $25,000 reward that had been advertised on a flyer at the New Haven courthouse. (*Id.* at 2228–29.) The conversation was recorded as follows:

> Lopez:  . . . that motherf*cker, if he wanted to, he could cash in on that f*cking money on that flyer. Right?
> Natal:  Yea.
> . . .
> Lopez:  He knows some sh*t. He was telling me about that sh*t. He showed me that flyer because he was pissed off. He was like, yo I can't believe this motherf*cker approached me like that. . . .
> Natal:  Yea.

(Gov't's Ex. 127.)

The Government also presented eyewitness testimony from Ms. Batts that she saw two men wearing facemasks, who she believed to be Mr. Natal and Mr. Morales, entering Mr. Morales's van at the corner of Poplar and Wolcott Streets and driving away around the time of the fire.  (Trial Tr. Vol. II at 506, 515-16; Trial Tr. Vol. IV [Doc. # 231] at 757–58.)  The jury also heard testimony from Ms. Feliciano that Mr. Natal had been at her home the night of the fire, but had left around 11:45, explaining that he was going to call his father.  (Trial Tr. Vol. X 2323–24.)  Mr. Vega testified that shortly thereafter Mr. Morales drove his son to the corner of Howard and Spring Streets so Mr. Natal could collect a $40 drug payment from Mr. Vega.  (Trial Tr. Vol. VIII at 1815–17.)   Ms. Feliciano testified that around 1:30 a.m., Mr. Natal had returned to her home and she was awoken by an angry phone call between him and his father about a fire.  (Trial Tr. Vol. X at 2325–26.)  Mr. Morales later gave conflicting statements to law enforcement about why he called his son, first stating that he was worried his son would be blamed for the fire, then explaining that he was worried his son had been in the building during the fire, and finally explaining that he called Mr. Natal because he had heard someone say Mr. Natal's name on the night of the fire.  (*See* Trial Tr. Vol. VII [Doc. # 233] at 1408–13; Trial Tr. Vol. IV at 809–11.)

Finally, Ms. Feliciano testified that Mr. Morales also confessed his role in the arson to her:

Q:    So pick it up.  You described him as being hysterical.
A:    Yes. I got in the car and he was being hysterical, crying.  I said, "What happened?"  He said "They about to give the death penalty to my son."
. . .
Q:    Okay, what was your reaction?  What did you say?
A:    I did not understand about giving the death penalty at the time, and so Morales had said, "You just don't understand, I had drove him."  So that kind of like leave me off guard.

> Q:     All right, let's break that down and unpack it.  He said, "I drove
>         him?"
> A:     Yes.
> Q:     What does that mean?
> A:     He drove him from the fire to my house.

(Trial Tr. Vol. X at 2362.)  Ms. Feliciano also testified that Mr. Morales again mentioned the fact that he drove his son from the fire on a second occasion in which he contemplated taking the blame for the incident himself.  (*Id.* at 2366.)

### D.     Witness Tampering

The Government offered testimony from Ms. Feliciano that Mr. Natal and Mr. Morales worked together to manipulate potential witnesses into falsely testifying to the grand jury.  She testified that Defendants gathered their family together to meet and discuss three falsehoods that should be included in their grand jury testimony:  (1) that Jorge Natal was going to purchase Mr. Morales's van; (2) that Mr. Natal had been home with Ms. Feliciano all night on the night of the fire; (3) and that a Mexican jewelry seller had attempted to light the first fire at 48-50 Wolcott Street.  (*Id.* 2366–68.)

Ms. Feliciano testified that Mr. Morales had instructed everyone to state that he had painted his van from blue to black because Jorge Natal intended to purchase it from him:

> Q:     What did Hector Natal or Hector Morales say about the van?
> A:     It was more Hector Morales.  He would sit there and tell us how
>         Jorge Natal was buying the van, he was going to buy the van with
>         income tax money, he is painting the van because he is going to
>         buy it.
> . . .
> Q:     Did you understand why you were being told that?
> A:     Yes.
> Q:     And what was your understanding?
> A:     My understanding were [sic] for everybody to get on the same page
>         as he was going to buy the van and the purpose why he painted it.

(*Id.* at 2369.)  She further testified that Jorge Natal did not really want to buy the van and that Mr. Morales threatened to kick him out of the house if he didn't "stick by the story." (*Id.* at 2370.)  She stated that when Jorge Natal continued to resist the pressure to testify about the van, he had to give Mr. Morales an Apple computer in order to stay in the house.  (*Id.* at 2375–76.)

Ms. Feliciano testified that Defendants also instructed her to testify that a Mexican man selling jewelry had tried to start the first fire at 48-50 Wolcott Street in order to draw suspicion away from Mr. Natal:

> Q:    And what was the testimony that folks wanted to have about the Mexican?
>
> . . .
>
> A:    All right.  That the Mexican was coming by selling jewelry, he went into the building that got on fire, and he tried to—well, he went in there, try—tried to sell them and somebody had tried to rob him for the jewelry, and he came back a couple of days later and tried to light the rugs on the hallway on fire.
>
> Q:    So, what did you understand you were to—how you should testify at the grand jury about the attempted arson earlier before the March arson?
>
> A:    What I had understand was try to put everything focus[]ing on the Mexican, he already tried to do it once, he going to do it again.
>
> Q:    And who was telling you to do that?
>
> A:    Morales.
>
> . . .
>
> Q:    Did Hector Natal say anything about the Mexican in these meetings?
>
> A:    Yes.
>
> Q:    What was that?
>
> A:    The only thing he would always say "you remember the Mexican was selling jewelry and they tried to rob him."

(*Id.* at 2377–79.)

Finally, Ms. Feliciano testified that Mr. Natal pressured her to provide a false alibi for him for the night of the fatal arson:

> Q:  And there is [sic] several topics of discussion.  And the third I think you told us was telling the grand jury where Hector Natal was on the night of the fire.
> A:  Correct.
> Q:  What were you being told? Who was telling you and what were you being told to say?
> A:  Natal would always say, "Remember I was home with you all night."  Like I felt a big pressure with him.  He would always tell me he was home all night, "Remember I was home all night with you."
> . . .
> Q:  But you knew different?
> A:  Yes.

(*Id.* at 2380.)

### E.   Destruction of Evidence

Finally, the Government presented photographs and witness testimony showing that Mr. Morales had painted his van from blue to black in an attempt to evade detection for the arson.  The Government offered photographs of the van both before and after it had been primed black.  (Gov't Exs. 24A, 24B.)  Further, the Government read Mr. Morales's grand jury testimony into evidence in which he admitted to painting the van himself after the fire.  (Trial Tr. Vol. IX at 2681.)  He further admitted that Jorge Natal, the alleged purchaser of the van, did not have a license, and had never paid him or filled out paperwork for the sale.  (*Id.* at 2683.)  As discussed above, Ms. Feliciano testified that she and other members of the family were instructed by Mr. Morales to falsify a story that the van had been painted to prepare it for sale to Jorge Natal, and that Mr. Morales threatened Jorge Natal with eviction when he refused to cooperate with the plan to testify falsely.

## II.     Legal Standard

"A Rule 29 motion [for a judgment of acquittal] should be granted only if the district court concludes there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006) (internal quotation marks omitted).  The Court must "view the evidence presented at trial in the light most favorable to the Government, and draw all reasonable inferences in its favor." *United States v. Cote*, 544 F.3d 88, 98 (2d Cir. 2008).  "[I]t is well settled that 'Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'" *Id.* at 99 (quoting *United States v. Guandagna*, 183 F.3d 122, 129 (2d Cir. 1999)).  "The Court must give full play to the right of the jury to determine credibility." *Id.*   "A defendant challenging the sufficiency of the evidence that was the basis of his conviction at trial bears a heavy burden." *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008) (internal quotations and citations omitted).

Under Federal Rule of Criminal Procedure 33, the Court has the discretion to grant a new trial "if the interest of justice so requires," particularly where there is "a real concern that an innocent person may have been convicted." *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005).  "In the exercise of its discretion, the court may weigh the evidence and credibility of witnesses," *Cote*, 544 F.3d at 101, but "[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment" *id.* (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).  While courts have broader discretion to grant a new trial under Rule 33 than to grant an acquittal under Rule 29, "courts must nonetheless exercise Rule 33 authority sparingly and in the most extraordinary of circumstances." *Id.*

**III.    Discussion**

Mr. Morales moves for a judgment of acquittal on each of the charges against him, arguing that the Government's evidence was insufficient and that the Government's rebuttal closing violated the Federal Rules of Criminal Procedure and constituted a prejudicial variance from the Second Superseding Indictment.   Mr. Morales also moves for a new trial on the grounds that the Court improperly denied his motion for severance, resulting in prejudicial spillover at trial.  Finally, Mr. Natal moves for a new trial, arguing that the Government's comments during opening statements and closing arguments represented gross misconduct warranting a new trial on all counts.

**A.    Mr. Morales's Motion for a Judgment of Acquittal**

Mr. Morales raises several arguments in support of his motion for judgment of acquittal, including that the Government's evidence was insufficient with respect to each count of the Second Superseding Indictment and that the Government's closing arguments violated the Federal Rules of Criminal Procedure, resulting in a prejudicial variance.

*1.    Accessory After the Fact to Arson*

Mr. Morales was charged in Counts Six, Seven, and Eight of the Second Superseding Indictment with accessory after the fact to arson resulting in death.  The Court instructed the jury that in order to find Mr. Morales guilty on these counts, the Government had to prove the following three elements beyond a reasonable doubt:

(1) First that on or about the date charged (March 9, 2011) the crime of arson resulting in death, as alleged in Counts Three, Four and Five was committed by Hector Natal;

(2) Second, that the defendant MORALES had knowledge of the commission of that crime and Natal's participation in it; and

11

(3) Third, that with such knowledge, MORALES in some way assisted Natal with the specific purpose or plan to hinder or prevent Natal's apprehension, trial, or punishment.

(Jury Instructions [Doc. # 191] at 44.)   Mr. Morales argues that the Government's evidence was insufficient as to each element of this offense.

Mr. Morales focuses the majority of his briefing on the argument that the Government failed to offer sufficient evidence to show that Mr. Morales had knowledge that Mr. Natal had committed the arson at the time he rendered the alleged assistance to his son.  Specifically, Mr. Morales notes that Ms. Feliciano's testimony that Mr. Morales twice confessed to driving his son to her house after the fire does not establish that Mr. Morales knew about the fire at the time he gave Mr. Natal the ride.  Mr. Morales further argues that Ms. Batts's eyewitness testimony also fails to establish his knowledge of the arson because she testified that she witnessed him and his son driving away from the scene at approximately 1:00 a.m., while the first 911 calls relating to the fire did not come in until 1:30 a.m.  Mr. Morales argues that this timeline is inconsistent with a fast-burning gasoline fire, and that therefore, at most, this establishes that Mr. Morales drove Mr. Natal from the scene to Ms. Feliciano's home before the fire was set, which would not satisfy the second and third elements of accessory after the fact—that Mr. Morales had knowledge of the crime, and acted with such knowledge to assist his son *after* the crime was committed.

However, these arguments ignore the standard that the Court must apply with respect to a Rule 29 motion—it must "view the evidence presented at trial in the light most favorable to the Government, and draw all reasonable inferences in its favor."  *Cote*, 544 F.3d at 98.  Ms. Batts testified that she saw both Mr. Natal and Mr. Morales at the scene of the crime, dressed in dark clothing and with masks covering part of their faces.

(Trial Tr. Vol. II at 506, 515-16; Trial Tr. Vol. IV at 757–58.)  The jury could infer from the nature of Mr. Morales's attire that he sought to avoid detection and thus was aware of some criminal activity.  Although there was no testimony as to the precise time that the fire started, the evidence presented at trial was not inconsistent with the theory that Mr. Morales drove Mr. Natal away from 48-50 Wolcott Street after the fire had been set—the Government's arson expert testified that it was "very difficult and almost nearly impossible" to pinpoint the exact timing of ignition and flashover in an arson investigation.  (Trial. Tr. Vol. V [Doc. # 232] at 1055.)  Furthermore, the Government presented testimony and phone records of a call from Mr. Morales to Mr. Natal at approximately 1:30 a.m. on the night of the fire.  (Trial Tr. Vol. X at 2325–26.)  Ms. Feliciano testified that this phone call upset Mr. Natal.  (*Id.*)  Mr. Morales was unable to provide law enforcement with a consistent explanation for why he called his son about the fire that night.  (*See* Trial Tr. Vol. VII at 1408–13; Trial Tr. Vol. IV at 809–11.)  The jury could have inferred from this that Mr. Morales called Mr. Natal about the fire because he already knew that Mr. Natal was responsible for the arson.  Finally, the jury heard testimony from Ms. Feliciano that Mr. Morales confessed on two separate occasions to driving Mr. Natal from the fire to her home.  (Trial Tr. Vol. X at 2362.)  Thus, when viewed in the aggregate and in the light most favorable to the Government, the evidence at trial was sufficient to establish that Mr. Natal committed the arson, and that Mr. Morales knew that his son had committed arson at the time he provided assistance to him by driving him away from the scene of the crime.

### 2. Narcotics Conspiracy

Mr. Morales was charged in Count One of the Second Superseding with conspiracy to distribute narcotics.  The Court instructed the jury that in order to find Mr.

Morales guilty on this count, the Government had to prove the following two elements beyond a reasonable doubt:

> (1) That two or more persons entered into the unlawful agreement charged in Count One—an agreement to possess with intent to distribute and to distribute controlled substances; and
>
> (2) That the defendants knowingly and intentionally became members of the conspiracy.

(Jury Instructions at 23.)  Mr. Morales argues that the Government's evidence at trial was insufficient to show that he knowingly and intentionally became a member of the narcotics conspiracy with his son.

Mr. Morales admitted to the grand jury that he was aware of his son's drug dealing activities (Trial Tr. Vol. XI at 2690–91), which by itself would be insufficient to convict him of the conspiracy.  However, at trial the jury heard testimony from Mr. Vega and Ms. Feliciano that Mr. Morales joined the conspiracy by driving Mr. Natal to narcotics transactions.  (Trial Tr. Vol. VIII at 1812, 1815–17; Trial Tr. Vol. X at 2302–08.) Both witnesses testified that Mr. Morales had warned his son that it was "hot in the streets" on these occasions.  (Trial Tr. Vol. VIII at 1812; Trial. Tr. Vol. X at 2332–04.) The jury could have inferred from these warnings that Mr. Morales knew that his son was selling drugs on these trips and thus knowingly and willingly assisted him by driving. Furthermore, Ms. Feliciano testified about a specific occasion when Mr. Morales had driven his son to a bulk marijuana transaction and stated that the smell of drugs in the car was overwhelming.  (*Id.* at 2302–03.)   This testimony is circumstantial evidence that Mr. Morales was aware of what was going on in his vehicle.  Ms. Feliciano also testified that Mr. Natal always gave his drug money to his father to hold.  (*Id.* at 2307–08.)  When viewed in the light most favorable to the Government, this evidence was sufficient to

prove that Mr. Morales knowingly and intentionally became a member of his son's narcotics conspiracy.

### 3.   *Witness Tampering*

Mr. Morales was charged in Counts Nine and Ten of the Second Superseding Indictment with witness tampering and conspiracy to commit witness tampering.   The Court instructed the jury that in order to find Mr. Morales guilty of witness tampering, the Government had to prove the following two elements:

> (1) That on or about the dates charged the defendant under consideration knowingly used intimidation, threatened or corruptly persuaded [Jessica Feliciano, Brenda Morales, Elizabeth Natal, or Jorge Natal], or attempted to do so, or engaged in misleading conduct toward one or more of the Individuals charged in the Indictment; and

> (2) that the defendant acted knowingly and with intent to influence the testimony of one or more of the individuals charged in the Indictment in an official proceeding.

(Jury Instructions at 50.)   With respect to conspiracy to commit witness tampering, the Court instructed the jury that it had to find the following three elements proved:

> (1) Two or more members entered into the particular unlawful agreement [to commit witness tampering];

> (2) the defendant knowingly and intentionally became a member of the conspiracy; and

> (3) that at least one overt act in furtherance of the conspiracy was knowingly and intentionally committed by at least one member of the conspiracy.

(*Id.* at 59.)   Mr. Morales challenges the sufficiency of the Government's evidence with respect to both of these counts.

At trial the jury heard extensive testimony from Ms. Feliciano that she attended multiple meetings at which Defendants pressured her to testify falsely:  (1) that Jorge

Natal was going to purchase Mr. Morales's van; (2) that Mr. Natal had been home with Ms. Feliciano all night on the night of the fire; (3) and that a Mexican jewelry seller had attempted to set fire to 48-50 Wolcott Street. (Trial Tr. Vol. X at 2366–80.) Ms. Feliciano also testified that Mr. Morales threatened Jorge Natal with eviction and demanded a bribe in the form of an Apple computer when Jorge resisted the attempts to persuade him to testify that the van had been painted because he was purchasing it. (*Id.* at 2370, 2375–76.) The gravamen of Mr. Morales's argument is that because this testimony was uncorroborated at trial, it is insufficient to sustain Mr. Morales's conviction. However, this argument again ignores the standard for a Rule 29 motion. When viewed in the light most favorable to the Government, Ms. Feliciano's testimony is sufficient to prove each of the elements of Counts Nine and Ten beyond a reasonable doubt.

### 4.    *Destruction of Evidence*

Mr. Morales was charged in Count Eleven of the Second Superseding Indictment with destruction and concealment of evidence. The Court instructed the jury that in order to return a guilty verdict with respect to Count Eleven, the Government had to prove the following three elements:

(1) That MORALES knowingly altered a tangible object—a blue 1994 Dodge Caravan;

(2) that MORALES did so with intent to impede, obstruct, or influence an investigation into the fatal arson crimes described in Counts Three, Four, Fix, Six, Seven, and Eight; and

(3) that an investigation into those crimes was within the jurisdiction of a department or agency of the United States.

(Jury Instructions at 65.) Mr. Morales challenges the sufficiency of the Government's evidence with respect to the second element, arguing that the Government failed to

establish beyond a reasonable doubt that Mr. Morales repainted his van with the intent to impede the arson investigation.

In making this argument, Mr. Morales focuses on evidence—such as the fact that he continued to drive the van after the crime, that he painted the van within sight of investigators, and that he re-registered it as a blue vehicle after the arson—that could give rise to an inference that Mr. Morales's decision to paint the van was entirely innocent. However, these arguments again ignore the fact that the Court must view the evidence in the light most favorable to the Government, drawing all inferences in its favor. At trial, Ms. Feliciano testified that she and other individuals were pressured to testify that the van was painted to facilitate its sale to Jorge Natal. (Trial Tr. Vol. X at 2369–76.) She further testified that Mr. Morales had threatened Jorge Natal when he refused to go along with this story. Mr. Morales admitted to the grand jury that he had heard that investigators were looking for a blue van in connection with the fire. (Trial Tr. Vol. XI at 2681.) He further admitted that Jorge Natal had no license and had never paid him or taken possession of the vehicle. (*Id.* at 2683.) The jury could have inferred from this testimony that the story about Jorge Natal's intended purchase was false and that Mr. Morales had actually been motivated to change the appearance of the van to avoid detection once he heard the rumor that investigators were looking for a blue van. Finally, the jury saw photographs of the van before and after it was painted (Gov't Ex. 24A and 24B), from which they could have concluded that it was unlikely the van would have been a more desirable purchase after the paint job. This evidence, when viewed in the light most favorable to the Government, is sufficient to prove the second element of Count Eleven.

5.      *Rebuttal Closing—Variance and Rule 29.1*

Finally, Mr. Morales argues that he is entitled to a judgment of acquittal because the Government's rebuttal closing violated Federal Rule of Criminal Procedure 29.1 and constituted a prejudicial variance with respect to the timing of the arson alleged in the Second Superseding Indictment and the timing of the arson proved at trial.   The Government denies that the evidence at trial materially varied from that charged in the indictment, and argues that it did not violate Rule 29.1 in its rebuttal closing.

"A variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment."  *United States v. Salmonese*, 352 F.3d 608, 621 (2d. Cir. 2003) (internal citations and quotation marks omitted).   "A defendant alleging variance must show 'substantial prejudice' to warrant reversal."  *United States v. Rigas*, 490 F.3d 208, 226 (2d Cir. 2007).   "A defendant cannot demonstrate that he has been prejudiced by a variance where the pleading and the proof substantially correspond, where the variance is not of a character that could have misled the defendant at trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense."  *Salmonese*, 352 F.3d at 621–22.   The Second Circuit has adopted a "relaxed" standard with respect to time allegations in an indictment, noting that "[p]articularly with respect to allegations of time, we have permitted proof to vary from the indictment provided that the proof fell within the period charged."  *United States v. Heimann*, 705 F.2d 662, 666 (2d Cir. 1983).

The Second Superseding Indictment alleges that "[o]n March 9, 2011, at approximately 1:15 a.m., NATAL set fire to the two-story residence located at 48-50 Wolcott Street, New Haven, Connecticut . . . . In the early morning of March 9, 2011,

after the fire was set, MORALES drove NATAL from the vicinity of the Wolcott Street residence to 76 Haven Street." (2d Superseding Indict. ¶¶ 9d–e.)  Mr. Morales argues that the Government's evidence varied from this first theory of the crime in its opening statement, in which the prosecutor stated that the fire was set at approximately 1:00 am. (Trial Tr. Vol. I at 44), and based on Ms. Batts's testimony that she saw Defendants getting into Mr. Morales's van and driving away from the scene at approximately 1:00 a.m. (Trial Tr. Vol. II at 506, 515-16; Trial Tr. Vol. IV at 757–58).  When defense counsel pointed out the inconsistencies in the Government's timeline, and offered testimony from other residents of the building that the fire did not start until closer to 1:30 a.m., Mr. Morales argues that the Government then switched to a third argument, completely at odds with the original indictment, that Ms. Batts could have seen Defendants driving away at 1:00 a.m., before the fire had been set, and that they returned to 48-50 Wolcott Street to light the fire shortly thereafter.  (Trial Tr. Vol. XV at 3556.)  Mr. Morales argues that the Government's shifting theory of the case surprised and misled his counsel during trial, and that the change in time presents a danger that he could be prosecuted a second time for the arson as an accessory before the fact or as a co-conspirator.  (Morales Mem. Supp. [Doc. # 211-1] at 27.)

However, the Government counters that Morales has failed to establish that there was a material variance between the time allegations in the Second Superseding Indictment and the evidence presented at trial, and contends that even if such a material variance occurred, Mr. Morales was not substantially prejudiced by it.  The Government does not dispute that it did not pinpoint the exact time at which the fire was set, and in fact offered testimony that it would be "almost nearly impossible" to do so.  (Trial. Tr. Vol. V at 1055.)  However, the Government's evidence at trial established: (1) that, based

on Ms. Batts's testimony, Defendants were seen wearing masks at the scene of the arson at approximately 1:00 a.m., (2) that based on 911 call records and the testimony of multiple witnesses, by 1:30 a.m. the fire was fully ablaze, and (3) that, based on Ms. Feliciano's testimony regarding Mr. Morales's confessions to her, Mr. Morales drove his son to her home after the fire.  This evidence in consistent with the allegations in the Second Superseding Indictment to within a range of fifteen minutes before or after the time alleged therein.  Furthermore, although the Government's theory that Ms. Batts witnessed Defendants driving away at 1:00 a.m., after the fire had been set, would represent a fifteen-minute variation from the allegation in the indictment, the Government's theory that Ms. Batts witnessed them drive away before the fire was set and that they returned to the scene shortly thereafter at which point Mr. Natal lit the fire and after which Mr. Morales drove him to Ms. Feliciano's home, would be entirely consistent with the allegation in the indictment that the fire was set at approximately 1:15 a.m.  Such a slight variation in the Government's first theory hardly represents a "material" difference between the indictment and the Government's proof such that reversal is warranted, especially in light of the Second Circuit's relaxed approach to allegations with respect to time.  *See Heimann*, 705 F.2d at 666.

Mr. Morales also argues that the Government's rebuttal closing warrants a judgment of acquittal because it violated Rule 29.1.  Rule 29.1 provides that "[c]losing arguments proceed in the following order:  (a) the government argues; (b) the defense argues; and (c) the government rebuts."  The advisory committee notes to the rule state that "[t]he rule is drafted in the view that fair and effective administration of justice is best served if the defendant knows the arguments actually made by the prosecution in behalf of conviction before the defendant is faced with the decision whether to reply and what to

reply."  Courts have relied on this reasoning to adopt the general rule that "Government counsel should not be allowed to develop new arguments on rebuttal, but should be restricted to answering the arguments put forth by defense counsel."  *United States v. Taylor*, 728 F.2d 930, 936 (7th Cir. 1984).

Mr. Morales argues that the Government violated this rule by introducing a theory of a "returning arsonist" for the first time in its rebuttal closing.  Specifically, Mr. Morales objects to the following statement by the Government:

> It's possible that Natal ran upstairs, poured the gas and got spooked by the Fosters when they came home.  Then he went back downstairs, got in the van with his father, they went around the corner and came back, and then he went upstairs and lit it.  Because you'll remember, the Fosters said there was a delay between when they smelled the gasoline and when it was actually lit.

(Trial Tr. Vol. XV at 3556.)  However, in his closing, in the context of arguing that the Government's timeline was inconsistent with a fast-burning gasoline fire, counsel for Mr. Morales specifically argued that "[t]here's  no evidence that the arsonist returned back to the house, which means the fire had to have been lit before 12:56."  (Trial Tr. Vol. XV at 3528.)  Furthermore, in attacking the Government's timeline, defense counsel specifically cited the Fosters' testimony regarding the state of the carpet when they returned home that evening and when they first smelled gasoline.  (*Id.* at 3530–31.)  Thus, it was defense counsel who first introduced this "returning arsonist theory" at trial, and defense counsel who first brought up the Fosters' testimony.  The Government was entitled to respond to this theory in its rebuttal, and limited itself to discussing the same evidence as defense counsel when it did so.  Therefore, the rebuttal closing did not violate the spirit of Rule 29.1 and does not represent grounds for granting a new trial.

For the foregoing reasons, Mr. Morales's motion for a judgment of acquittal is denied.

### B.      Mr. Morales's Motion for a New Trial

Mr. Morales moves for a new trial on the basis of retroactive misjoinder, arguing that the Court's failure to grant his motion for severance resulted in prejudicial evidentiary spillover at trial.  Pursuant to Rule 14 of the Federal Rules of Criminal Procedure, "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trial, or provide any other relief that justice requires."  "The Supreme Court has instructed that 'the trial judge has a continuing duty at all stages of the trial to grant a severance if prejudice does appear.'" *United States v. Rittweger*, 524 F.3d 171, 179 (2d. Cir. 2008) (quoting *Schaffer v. United States,* 362 U.S. 511, 516 (1960)).  "The typical spillover claim is that evidence admissible against only one defendant is prejudicial to all defendants," *United States v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992), but "the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance," *Rittweger*, 524 F.3d at 179.  In order to succeed on his motion for a new trial as a result of prejudicial spillover, Mr. Morales must establish that the spillover was so prejudicial as to constitute a "miscarriage of justice."  *United States v. Locascio*, 6 F.3d 924, 247 (2d Cir. 1993).  In assessing his claim, the Court should consider (1) the inflammatory nature of the spillover evidence, (2) how related the spillover evidence was to the charges against Mr. Morales, and (3) the strength of the Government's case on the basis of the remaining evidence.  *See United States v. Vebeliunas*, 76 F.3d 1283, 1294 (2d Cir. 1996).

Mr. Morales cites three categories of evidence that he claims resulted in prejudicial spillover.  First, he argues that "[m]uch, if not all, of the evidence against Natal on Count One would not have been admissible against Morales if they were separately tried." (Morales Mem. Supp. at 32.)  However, this contention is without merit.  Because Defendants were both charged with conspiracy, all of the Government's evidence establishing Mr. Natal's participation in the narcotics conspiracy would have been admissible at a separate trial against Mr. Morales, with the exception of Mr. Natal's guilty plea, which the Government did not reference at trial.  *United States v. Salameh*, 152 F.3d 88, 111 (2d Cir. 1998) ('When a defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant.")  Although counsel for Mr. Natal mentioned the guilty plea in opening statements (Trial Tr. Vol. I at 63), the reference was fleeting, and in light of the significant evidence of Mr. Morales's involvement in the narcotics conspiracy outlined above, it did not give rise to such significant prejudice as to merit a new trial.

Mr. Morales next argues that the evidence that Mr. Natal committed attempted arson at 48-50 Wolcott Street before the fatal arson would not have been admissible against him if they were tried separately.  Mr. Morales cites no legal authority for the proposition that this evidence would not have been admissible against him at a separate trial.  As the Government argues, this evidence would have been relevant both to the witness tampering counts, to explain the Mexican jewelry seller fabrication, and also could have been offered as evidence tending to establish that Mr. Natal committed the fatal arson, which is an element of the accessory after the fact charges against Mr. Morales.  Furthermore, Mr. Morales argues that the nature of the prejudice he suffered as

a result of this evidence was to erroneously link him to a prior attempted arson by his son. However, the testimony regarding the attempted arson made no reference to Mr. Morales and it is unlikely the jury would have been so confused as to be unable to separate this evidence from the case against him.  The Court instructed the jury that it was required to consider the evidence against each defendant separately (Jury Instructions at 18), and the Court presumes they followed those instructions, *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions.").  Therefore, Mr. Morales has not established that he is entitled to a new trial on these grounds.

Finally, Mr. Morales contends that he was significantly prejudiced by the admission into evidence of testimony and recordings in which Mr. Natal confessed to the fatal arson on three separate occasions.   The Government does not dispute that these confessions are not admissible against Mr. Morales with respect to the accessory after the fact, witness tampering, and destruction of evidence counts.  In its instructions, the Court specifically admonished the jury as follows:

> Some of the evidence in this case was limited to one defendant.   Any evidence  admitted solely against one defendant may be considered only as against that defendant and may not in any respect enter into your deliberations on the other defendant.  Similarly, any evidence offered on some counts but not on others may only be considered on those counts.

(Jury Instructions at 18.)  However, the trial transcript reflects that the Court never gave specific limiting instructions that the jury could not consider evidence of Mr. Natal's confessions against Mr. Morales, and thus there is a risk that the jury may have considered this evidence against Mr. Morales at trial.

As the Court previously explained in its ruling on the motion to sever, Mr. Natal's admission that he set the fire because of a drug debt may have been admissible against Mr. Morales with respect to the narcotics conspiracy as a co-conspirator statement.  (*See*

Severance Ruling [Doc. # 68] at 4.)  Furthermore, the Government presented extensive evidence unrelated to these confessions with respect to the narcotics conspiracy and to Mr. Morales's involvement in it.  Thus, it is unlikely that Mr. Morales suffered material prejudice with respect to Count One as a result of the admission of these confessions at trial.  Similarly, with respect to the charges of witness tampering and destruction of evidence, the Government's case rested primarily on Ms. Feliciano's testimony regarding the "family meetings" in which Mr. Morales pressured her and other potential witnesses to testify falsely to the grand jury so as to deflect suspicion from his son and to provide an innocent explanation for his decision to repaint his van.  In light of this testimony, the admission of Mr. Natal's confessions is unlikely to have tipped the balance of the evidence against Mr. Morales on these charges and thus did not represent a "miscarriage of justice" with respect to Counts Nine, Ten and Eleven.

Nonetheless, there is a significant risk that the jury relied on Mr. Natal's confession in reaching its verdict against Mr. Morales with respect to the accessory after the fact charges in Counts Six, Seven, and Eight.  As discussed above, the jury was never specifically informed that they could not consider Natal's confessions with respect to the charges against Mr. Morales.  The jury was instructed that the Government needed to prove that Mr. Natal committed the fatal arson in order for them to return a guilty verdict on the accessory after the fact charges.  Thus, these charges necessarily required the jury to consider Mr. Natal's guilt in the context of returning a verdict against Mr. Morales, which would exacerbate the risk that the jury would improperly consider evidence admissible only against Mr. Natal in the context of these charges.  Furthermore, the recordings and witness testimony regarding Mr. Natal's confessions represented the most compelling evidence that he committed the arson and overwhelmed the other evidence of

25

his guilt at trial.  Because there was a significant risk of spillover with respect to Mr. Natal's confessions, and because these confessions represented such compelling and significant evidence with respect to the arson, the Court concludes that the admission of this evidence without a specific instruction that the jury could not consider it against Mr. Morales resulted in material spillover prejudice to Mr. Morales on the accessory after the fact charges, warranting a new trial.  Therefore, the jury's verdict on Counts Six, Seven, and Eight is vacated, and Mr. Morales's motion for a new trial is granted with respect to those counts, and denied in all other respects.

### C.    Mr. Natal's Motion for a New Trial

Mr. Natal also moves for a new trial on the basis that the Government's comments in its opening statement and closing argument represented gross prosecutorial misconduct, warranting a new trial.  The Government counters that none of the statements identified by Mr. Natal are so egregious or prejudicial as to warrant this relief. The Second Circuit has explained that "[i]t is a rare case in which improper [government] comments are so prejudicial that a new trial is required." *United States v. Ferguson*, 676 F.3d 260, 283 (2d Cir. 2011) (internal citations and quotation marks omitted).  "Such comments do not amount to a denial of due process unless they constitute egregious misconduct." *Id.* (internal citations and quotation marks omitted).  In ruling on a claim for a new trial based on a prosecutor's improper comments, courts must consider:  "(1) the severity of the misconduct; (2) the measures adopted to cure it; and (3) the certainty of conviction in the absence of misconduct." *Id.* (internal citations and quotation marks omitted).

1.    *Opening Statements*

Mr. Natal argues that the Government's opening statement with was rife with improper appeal to emotion.  The prosecutor began her opening statement as follows:

> Good morning.  Not far from here, early in the morning of March 9, 2011, the defendant Hector Natal, set fire to the home of two families, the Roberson family and the Foster family.  These families lived in apartments on the second and third floor at 48-50 Wolcott Street in New Haven.

> At one o'clock in the morning, as you would expect, many of them were asleep; 17 people in total, grandmothers, mothers, teenagers, young children, many women.  They thought they were safe, secure in their home.  They were completely unaware of the horror that awaited them.

> Gasoline was poured on the carpet on the second floor hall.  It spread from the lip of the door of the Roberson apartment to the lip of the door of the Foster apartment.  Then the gasoline was lit, igniting a powerful flame. The fire was fierce.  It started in the hall landing outside the front doors, moved up the interior stairwell and entered and destroyed both apartments.

> You will hear the terror and chaos that followed.  The Robersons and the Fosters awoke and attempted to flee.  Toddlers were passed down from the windows into the arms of neighbors waiting below.  Pregnant women, young children, were forced to jump.  Two, a grandmother and a teenager, were rescued by firefighters with ladders who brought them to safe ground.  You will see photos and a video of this fire and the devastation that it created.

> The Foster family survived.  The Robersons were not so fortunate.  You will learn that Wanda Roberson, a 42-year-old mother of six, is one of the heroes of this tragic story, for the evidence will show that—

(Trial Tr. Vol. I at 44–45.)  At this point, counsel for Mr. Natal interrupted with an objection, which the Court sustained at sidebar, remarking that the address had been "very argumentative" and admonishing the prosecutor to limit herself to a roadmap of the case, tagging her statements to witnesses or exhibits the Government expected to present.  (*Id.* at 46.)

Mr. Natal argues that the prosecutor ignored this admonition and continued to improperly inject emotion into her statement in an attempt to improperly influence the jury.   Specifically, he identifies five additional comments which he contends are improper, argumentative, emotional appeals and were un-tethered to the Government's proposed evidence at trial:

- There will also be evidence and testimony that Natal fought for every dollar.  He was not happy when customers were short on money, and sometimes intimidated, yelled, and threatened them.  (*Id.* at 48.)

- Just as the evidence will show that Natal was a drug dealer, it will also show that Natal targeted the people at the Wolcott Street house.  (*Id.* at 49.)

- You will learn that Natal was angry and the people at Wolcott were in his sights.  There will be testimony that long before the fire, he bullied and threatened them.  (*Id.* at 50.)

- The evidence will show that eight months before the fatal fire, in July 2010, the Robersons—and they will testify—were celebrating a child's birthday in their backyard.  Natal set off m-80's, heavy duty firecrackers.  He set them off close to the children.  The children were upset and began to cry.  When the Robersons asked Natal to stop, he went into a rage and the matter escalated, words were exchanged.   Rather than back down and move on, Natal threatened the Robersons, yelling, swearing, wanting to fight.  (*Id.*)

- And that was not the only time Natal threatened the Robersons.  The evidence will show that months later, two young Roberson cousins ran upstairs to visit the apartment where Wanda lived, and they found Natal at the top of the stairs attempting to light the carpet on fire.  They were terrified and ran into the apartment and called the police.  (*Id.* at 50–51.)

Mr. Natal argues that each of these excerpts was improper, and that when considered as a whole with the rest of the Government's opening statement, represented such an egregious emotional appeal that the jury was irrevocably tainted and a new trial is warranted.

With respect to the first excerpt, Mr. Natal argues that the prosecutor's statements did not fit with the evidence at trial, because there was only one witness to support the contention that Mr. Natal "fought for every dollar" and threatened his customers. However, at trial, the Government offered a recording in which Mr. Natal directed one of his associates—Chad Mendez—to collect a $20 drug debt from Fernando Suarez, a blind, diabetic man, who was suffering from kidney failure. (See Gov't's Ex. 121; Trial Tr. Vol. XI at 2726.) When the associate expressed reluctance to be forceful with the man because of this health problems, Mr. Natal stated "If that's what he wants, feel me, if I'm going to go over there, I'll wanna put my hands on that n*gga. Feel me? He can't see nothing. . . . I don't get sorry for nobody, my n*gga. Word up, f*cking if you're a cripple or not, n*gga. Dead serious, n*gga. . . . I'm sayin' business is business." (Id.) Mr. Suarez testified at trial that Mr. Mendes warned him "for your best, do not f*ck with [Natal]." (Id. at 2731). Thus, there was evidence offered at trial that Mr. Natal was prepared to be very forceful even when collecting the smallest debt from a vulnerable individual. Thus, the prosecutor's statement to this effect was not inappropriate or inconsistent with the evidence.

With respect to the second excerpt, Mr. Natal argues that there was nothing in the record to support the contention that he "targeted" the individuals at Wolcott Street, and that this comment therefore "tainted the jury with misinformation." (Natal Mem. Supp. at 6.) In response, the Government argues that it offered evidence that Mr. Natal attempted to light the residence on fire after an altercation with the residents (Trial Tr. Vol. XI at 2572–79), that Ms. Batts overheard Mr. Natal and Tobius Foster arguing about money (Trial Tr. Vol. II at 475–76), that Mr. Natal was recorded telling Mr. Vega that he did not trust Mr. Foster (Gov't's Ex. 113), and that Mr. Natal himself cited a drug debt

owed by one of the residents as his reason for setting the fatal fire (Gov't's Ex. 104). Therefore, while Mr. Natal may quibble with the prosecutor's use of the word "targeted" there was ample evidence presented at trial of an ongoing animosity between Mr. Natal and his neighbors at 48-50 Wolcott Street.

With respect to the third and fourth excerpts Mr. Natal argues that the Government's characterization of the argument between Mr. Natal and the Robersons in July 2010 was exaggerated and that the evidence at trial did not warrant the statement that Mr. Natal flew into a "rage." The witnesses at trial offered differing accounts of the July 2010 incident, but the Government did offer evidence that Mr. Natal was "loud," "threatening," and "ready to fight at any moment." (Trial Tr. Vol. II at 371.) Thus, although the prosecutor undoubtedly editorialized with respect to the incident, her characterizations were not so far afield from the actual evidence at trial as to represent gross misconduct.

Finally, with respect to the fifth excerpt, Mr. Natal argues that the prosecutor's use of the word "terrified" was unwarranted to describe Jammi Neely. Although Ms. Neely did not describe herself as "terrified" when she testified, Mickaylah Roberson did state that the children were "screaming" when they came into the apartment to call the police. (Trial Tr. Vol. XI at 2596–97.) Here again, while some of the prosecutor's editorializing may have been inappropriate, it was not without some basis in the record at trial and thus was not egregious.

On the whole, while the excerpts Mr. Natal complains of could be characterized as editorializing, they are for the most part grounded in the evidence that the Government presented at trial. Although the start of the prosecutor's opening remarks clearly represented an improper emotional appeal, the Court sustained Defendants' objection

30

and the remainder of the opening statement was largely factual. Therefore, any impropriety fell short of the egregious actions required to warrant a new trial. Furthermore, the Court not only sustained Defendants' objection, but also gave a limiting instruction[1] to the jury immediately after the parties' opening statements to cabin any potential prejudice to Defendants:

> Now, ladies and gentlemen, I want to remind you again that opening statements are not evidence. They don't contain evidence. They may contain opinions and views of the lawyers as to what they claim the evidence will show, but they're not evidence. So, just, please, keep that in mind. I hope it will provide, however, a roadmap as to what the purpose is of the questioning and the testimony.

(Trial Tr. Vol. I at 72.) Finally, the Government presented strong evidence of Mr. Natal's guilt in this case that was untainted by these appeals to emotion. Significantly, Mr. Natal did not contest the narcotics conspiracy charges, and the Government offered evidence that Mr. Natal confessed to the fatal arson on three separate occasions, two of which confessions were recorded. One of the witnesses to these confessions was an undercover Fire Marshal, and another—Mr. Vega—struck the Court as candid despite his history. As outlined above, the Government offered compelling testimony from Ms. Feliciano with respect to the witness tampering conspiracy. Although Ms. Feliciano certainly had a motive to testify against Defendants, her testimony did not strike the Court as so incredible as to merit its wholesale rejection. With respect to the attempted arson, in addition to the somewhat halting testimony of the eyewitness, Ms. Neely, the Government offered testimony from Mickaylah Roberson that corroborated her story.

---

[1] Defendants made an oral motion for a mistrial at the end of the Government's opening statement. The Court informed the parties that it would issue a limiting instruction, rather than granting the motion, but that it would entertain written motions for mistrial with respect to the openings. (Trial Tr. Vol. I at 62.) However, no such motions were ever filed.

Therefore, the Court concludes that any potential prejudice resulting from the Government's improper statements in its opening statement was not so substantial as to warrant a new trial.

>        *2.      Closing Arguments*

Mr. Natal also argues that the Government committed gross misconduct in its rebuttal closing by improperly vouching for its witnesses and disparaging defense counsel and Mr. Natal.  The Government counters that defense counsel opened the door to its rebuttal comments in his own summation, and that therefore not only is a new trial not warranted, but the Government's comments were in fact permissible under Second Circuit law.  *See United States v. Rivera*, 971 F.2d 876, 883 (2d Cir. 1992) ("[D]efense argument may, in a proper case, 'open the door' to otherwise inadmissible prosecution rebuttal.")

Mr. Natal has identified the following five excerpts from the Government's rebuttal closing as illustrative of the prosecutor's misconduct meriting a new trial:

- The defense would have you believe that this case is about bedbugs and landlord/tenant disputes.  They would have you believe that Gabriel Vega is a mastermind ventriloquist and a cunning con man fabricating Natal's voice on the confession tape.  They would have you believe that Vega, Feliciano, Batts, Jammi Neely and others all independently got together to falsely accuse Hector Natal. They would have you believe that an incompetent team of law enforcement officials were conned and decided, for some inexplicable reason, to falsely accuse Hector Natal and Hector Morales.  We are not recent college grads and we did not buy a lemon.  Ladies and gentlemen, no one was conned here, and don't you be conned.  (Trial Tr. Vol. XV at 3545.)

- Natal's undeniable ties to Wolcott Street back in July.  He's setting off M-80s.  It's no joke.  Who does that?  That's little kids.  He's setting off, blowing up a plastic truck.   Makuc testified it's dangerous, M-80s are dangerous.   They're scared. Margaret Batts (sic) talked about him indicating he had a gun.  Jamaica Roberson said he swore at her, threatened her, talked about getting a gun.  Who does that? (*Id.* at 3459.)

32

- And think about it, this [earlier] attempt is the exact same location that the ultimate fatal fire is set, the second floor landing at the Wolcott Street house. The defense would have you believe that this is all some kind of cosmic coincidence, that all these people from Jammi Neely to Jamaica Roberson to Jessica Feliciano to Margaret Batts to Gabriel Vega, all independently decided to frame Hector Natal. (*Id.* at 3550.)

- And ladies and gentlemen, I submit they were brave, brave to testify in this case against these defendants that they knew where murder is at stake. (*Id.* at 3553.)

- Now you see them [Hector Natal and Tobius Foster] together on the video on March 28th talking together about pills. Now, of course, Natal's friendly to Tobius at that point because the last thing he wants is for Tobius or anyone to think that he had a motive to torch Wolcott . . . . We can't read the defendant's mind, but you saw him on that tape talking about Fernando. He sounded menacing and soulless. . . . We did not call the Fosters because they, too, had real credibility issues. . . . These [Karim and Shirl Foster] are not reliable witnesses. That's why the government did not call them. . . . Don't get conned. (*Id.* at 3354–3558.)

Mr. Natal argues that each of these excerpts was improper, and that when considered as a whole, represented such egregious prosecutorial misconduct as to warrant a new trial.

With respect to the first excerpt, Mr. Natal argues that the prosecutor mischaracterized defense counsel's arguments in a disparaging manner, and improperly vouched for its case by using "we" to refer to the Government and the jury. The Government counters that defense counsel opened the door to its rebuttal with his extended metaphor in his closing comparing the Government's handling of the case to his ill-advised decision as a recent college graduate to throw good money after bad into a lemon of a car. (*See id.* at 3507–08.) In its ruling on Defendants' motion for a mistrial, the Court previously recognized that "[t]he issue of recent graduates and lemon cases was clearly a theme of a defendant to which the argument of not being recent graduates and not being—having a lemon case is obviously argument and nothing improper." (*Id.* at

3571.)   Pursuant to the doctrine of invited response, it was not improper for the prosecutor to respond in kind to defense counsel's rhetorical flourishes.  Although the Government's use of the word "we" could have been interpreted by the jury as an attempt by the prosecutor to include herself among their number, it was not entirely inappropriate in this context in response to defense counsel's use of the term "they" to refer to the prosecutors and law enforcement officers who allegedly "bought a lemon" with their theory of the case.  Thus the impropriety, if there was any, was limited and isolated.  *Cf. United States v. Nersesian*, 824 F.2d 1294, 1327–28 (2d Cir. 1987) (prosecutors limited improper use of the word "I" was insufficient to warrant a new trial).

With respect to the second excerpt, Mr. Natal argues that the prosecutor improperly appealed to the jurors' emotions by asking the rhetorical question "who does that" in an attempt to demonize him.  The Government argues that this was a one-time rhetorical device used to highlight Mr. Natal's strong dislike for the residents of 48-50 Wolcott Street.  However, when viewed together with the Government's later comments that Mr. Natal sounded "menacing and soulless," and  describing his conduct toward Tobius Foster as disingenuous and scheming, the Government crossed the line of permissible argument with respect to Mr. Natal's actions and motivations.   The Government's argument that in the context of his attempts to collect the $20 debt from Mr. Suarez, Mr. Natal did appear menacing and soulless notwithstanding, such language is clearly inflammatory and added little to the Government's theory of the case beyond an attempt to provoke jurors' aversion to Mr. Natal.

With respect to the third excerpt, Mr. Natal argues that the prosecutor improperly mocked defense counsel for making an argument it did not make.  Specifically, Mr. Natal argues that the Government's sarcastic discussion of a "cosmic coincidence" leading all of

the Government's witnesses to fabricate testimony was inflammatory and did not accurately reflect defense counsel's arguments. However, defense counsel did aggressively attack the credibility of many of the Government's witnesses during his closing argument. Furthermore, the Second Circuit has previously recognized that a prosecutor may properly express mild sarcasm at the implausibility of a defendant's claim that the Government's witnesses are all committing perjury. *United States v. Rodriguez*, 587 F.3d 573, 583 (2d Cir. 2009). Thus, the prosecutor's sarcastic use of the term "cosmic coincidence" was a permissible rhetorical flourish.

With respect to the fourth excerpt, Mr. Natal argues that the prosecutor improperly introduced the term "murder" into the argument, even though intent to kill was not an element of the arson charges against him. The Government concedes that this was a technically incorrect use of the term, but argues that it does not represent egregious misconduct. However, in light of the Government's emotional description of the victims of the fire during its opening statement, and its focus on Mr. Natal's ruthlessness in its rebuttal closing, this comment did present a potential for unfair prejudice to Mr. Natal. Furthermore, the prosecutor's declaration that the witnesses were "brave" to testify does border on improper vouching.

Finally, with respect to the fifth excerpt, Mr. Natal argues that the prosecutor's comments constitute improper vouching for the Government's witnesses. At trial, the Court agreed that these statements were close to the line and sustained an objection to this portion of the rebuttal closing. Although defense counsel did raise the issue of the Government's failure to call certain witnesses at trial, which would open the door for the prosecutor to address the issue in her rebuttal, the nature of her comments bordered on vouching and when viewed as a whole, were improper.

35

On the whole, however, while the some of the excerpts Mr. Natal cites were improper, defense counsel opened the door to the others, and thus the Government's rebuttal closing did not constitute egregious prosecutorial misconduct.  Furthermore, the Court sustained an objection to one of the cited examples of improper vouching in the middle of the rebuttal summation.  (Trial Tr. Vol. XV at 3556–57.)  Although the Court ultimately denied Defendants' motion for a mistrial with respect to the rebuttal closing, it did offer to provide a further limiting instruction on improper vouching, but Defendants declined the Court's offer.  (*Id.* a 3571–72.)  Thus, the Court was able to eliminate some of the potential for prejudice at the time the improper comments were made.  Finally, as discussed above, there was ample evidence at trial in support of a guilty verdict against Mr. Natal on all counts.  Therefore, the Court concludes that any potential prejudice resulting from the Government's inappropriate rebuttal closing was not so substantial as to warrant a new trial.

For the reasons discussed above, Mr. Natal's motion for a new trial is denied.

## III.    Conclusion

For the foregoing reasons, Mr. Morales's Motion [Doc. # 211] for a Judgment of Acquittal and for a New Trial is GRANTED with respect to Mr. Morales's request for a new trial on Counts Six, Seven and Eight, and DENIED in all other respects.  Mr. Natal's Motion [Doc. # 249] for a New Trial is DENIED.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 7th day of August, 2014.